AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

### DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

V.

THOMAS SCOLA
FEDERICO NIVAR

**CRIMINAL COMPLAINT**

CASE NUMBER: MJ#04-812-MBB

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about ___December 2003 - March 2004___ in ___Middlesex and Essex___ county, in the

_____ District of ___Massachusetts___ defendant(s) did, (Track Statutory Language of Offense)
knowingly and intentionally combine, conspire, confederate, and agree with each other to distribute heroin, a Schedule I controlled substance

in violation of Title___21___ United States Code, Section(s) ___846___ .

I further state that I am a(n)___DEA Special Agent___ and that this complaint is based on the following
_____
Official Title
facts:

See attached affidavit of DEA Special Agent Steven C. Story attached hereto
and incorporated by reference herein.

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

04-07-2004 @ 2:05PM
_____
Date

at        Boston, Massachusetts
_____
City and State

Marianne B. Bowler
Chief U.S. Magistrate Judge
_____
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

## Affidavit of Steven C. Story

I, Steven C. Story, on oath depose and state that:

1.    I am a Special Agent with the Drug Enforcement Administration ("DEA") and I have been so employed for approximately 17 years.  During the course of my career, I have received specialized narcotics training from DEA and I have been involved in over 400 narcotics investigations involving the use of various investigative techniques, including controlled purchases of narcotics, the use of confidential informants and other cooperators, physical surveillance, electronic surveillance, and financial investigations.  Since June 2003, I have been assigned to DEA's Mobile Enforcement Team, which has been conducting an investigation of certain narcotics dealers on the North Shore.

2.    Since December 2003, I have been involved in an investigation of **Thomas Scola ("Scola")**, a 36-year old man who resides at various locations in Gloucester, and **Federico Nivar ("Nivar")**, a 43-year old man who resides in Lawrence.  The information set forth in this affidavit is based on my personal participation in this investigation as well as on information provided to me by other DEA agents, law enforcement officers, and public and private databases.  I am submitting this affidavit to establish probable cause that Scola and Nivar have conspired with each other to distribute heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 846.  Accordingly, I have

not included each and every fact known to me as a result of my participation in this investigation.

3.   As a result of my participation in this investigation, I have learned that **Scola** has an adult criminal history in Massachusetts dating back to 1989, including the following prior convictions: (1) possession of cocaine with intent to distribute (1989); (2) possession of marijuana (1989 - continued without a finding); (3) larceny from the person and assault and battery (1991); (4) uttering and receiving stolen property (1991); (5) arson (1991); (6) breaking and entering in the night time and larceny from a building (1991); (7) attempt to commit a crime (1993); (8) possession of heroin, cocaine, and marijuana (1993); (9) larceny (4 counts) (1993); (10) possession of cocaine (1993); (11) unlawful possession of a firearm and receiving stolen property (4 counts)(1994); and (12) carrying a dangerous weapon (knife) (1995).  In addition, Scola has the following charges pending in the Gloucester District Court: (1) possession of heroin (charged on 7/29/03); (2) possession of heroin with intent to distribute and commission of a drug crime in a school zone (charged on 7/29/03; separate docket number); and (3) possession of heroin and conspiracy (charged on 11/12/03).  I have also learned that **Nivar** is a citizen of the Dominican Republic who has a listed address in Lowell but who actually resides in Lawrence. In December 1997, he was charged in the Lowell District Court

2

with possession of heroin with intent to distribute.    In March

1998, the case was continued without a finding for one year and

then dismissed in March 1999.

        4.    From December 18, 2003 to March 30, 2004, a DEA

undercover agent ("UCA") made 13 controlled purchases of heroin

directly from **Scola**.    The first such purchase occurred in front

of a motel in Gloucester (Essex County), where Scola was then

residing.    The subsequent purchases occurred in the parking lot

of a convenience store in Reading (Middlesex County) near Route

128, except for one purchase, which occurred in the parking lot

of a liquor store in Peabody (Essex County).    The investigation

revealed that, prior to the sales, Scola negotiated the sales

over the telephone with the UCA, stating in several of the

telephone conversations that he would be meeting with his regular

supplier before the sale.    Scola then employed various persons to

drive him from Gloucester to the agreed-upon location for each

sale.    The investigation further revealed that, prior to and

immediately after most of the sales, Scola was driven to and met

with his heroin supplier in a nearby residential neighborhood in

Wakefield.    During the investigation, the supplier was identified

as **Nivar**.    Nivar was frequently observed driving a Toyota Camry

registered to him at his address in Lowell.    All of the hand-to-

hand purchases from Scola were surveilled and recorded by DEA and

many of them were videotaped.    Surveillance agents observed many

                                    3

lot of Fast Freddy's, a convenience store and gas station, near Route 128 in Beverly (Essex County). Scola further stated that his "driver" would be taking him there and that he was talking to his source "now" to make the arrangements. The UCA was the first to arrive in the vicinity of Fast Freddy's and he waited inside his car for Scola to appear. After arriving at the location, Scola telephoned the UCA and instructed him to follow his car down Route 128. During a subsequent telephone call, Scola gave the UCA directions to a Cumberland Farms store located near Route 128 in Reading. Scola told the UCA to wait at the Cumberland Farms until he returned with the "product" (heroin).

7.     A short time later, Scola arrived at the Cumberland Farms parking lot in a car driven by another male. Scola exited his vehicle and got into the UCA's front passenger seat. Scola sold a clear plastic bag of heroin to the UCA for $800.00 in cash. Scola then exited the UCA's car after the sale and returned to the car driven by the other male. The substance purchased on that date was subsequently analyzed at a DEA laboratory and determined to be 4.7 grams of heroin.

8.     Immediately after the above sale of heroin, surveillance units followed Scola as he was driven to a nearby location in Wakefield (Middlesex County). His car was observed by surveillance agents parked next to a black Toyota Camry, which was registered to Federico Nivar of Lowell. Scola was observed

5

walking away from the passenger door of the Camry back to the car driven by the other male.  Surveillance agents then followed the Camry, which was occupied by two males, to a residence in Lawrence.  Both males entered the residence and, after a period of time, the Camry's driver exited the residence and drove away in the Camry.  The Camry was stopped by a uniformed police officer and, during the course of this traffic stop, the driver identified himself by means of a Massachusetts driver's license as Federico Nivar, the registered owner of the Camry.

## Controlled Purchase on January 21, 2004

9.   On January 20, 2004, the UCA and Scola had a telephone conversation during which Scola agreed to sell the UCA eight grams of heroin at $145.00 per gram.  Scola stated he would contact his source of supply and get back in touch with the UCA.  During a later telephone call that day, Scola and the UCA agreed to speak the next day at approximately 1:00 pm to make arrangements for the heroin sale.  Scola stated he would call his source to place the order.

10.   The next day, January 21, 2004, the UCA placed a recorded call to Scola.  During the call, Scola stated he was waiting to hear from a couple of people and that he would meet the UCA at the China Jade Restaurant in Beverly.  This is in the same immediate area as Fast Freddy's where Scola and the UCA had previously met.  Scola told the UCA he would call him before

6

leaving.

11.   Later that day, Scola called the UCA and told him
that he was on his way and that he would be in the same car as on
the previous occasion (a silver Plymouth used during the purchase
on January 8, 2004).  As the UCA was driving to the Beverly
meeting place, he received another telephone call from Scola, who
told him that when he arrived at the meeting place he should
follow Scola's car to the Essex County Jail in Middleton.  Scola
stated that he had to bring someone money.  The UCA arrived at
the meeting place, observed the silver Plymouth, and followed it
to the vicinity of the Middleton Jail.  While still in his car,
the UCA was able to communicate with the driver of the Plymouth
that he would meet Scola at the agreed-upon location in Reading
for the sale.  The UCA then left the silver Plymouth and drove to
the Cumberland Farms parking lot in Reading.

12.   Surveillance agents followed the silver Plymouth from
Middleton to the vicinity of Exit #40 off of Route 128, where
Scola was observed talking on a pay telephone at a Honey Dew
Donuts in that area.  The surveillance team then followed Scola
from the Honey Dew Donuts to the same location in Wakefield as he
had been observed on January 8.  Minutes before Scola's vehicle
arrived there, other surveillance agents followed Nivar's black
Toyota Camry from the Exit #40 to the same location.  When
Scola's car arrived at the Wakefield location, it drove slowly by

7

the Camry. The Camry positioned itself behind the Plymouth and followed it. Surveillance was briefly discontinued at this time, but minutes later the two cars were observed driving in tandem in that area. Nivar was observed to be the driver of the Camry.

13. After leaving this area, Scola was driven directly to the parking lot of the Cumberland Farms store in Reading. Scola then exited the silver Plymouth, entered the UCA's car, and sold two clear plastic bags of heroin to the UCA for $1,160.00 in cash. Before leaving the UCA's car, Scola stated that he had to get the money to his guy. The UCA understood this comment to refer to Scola's heroin supplier. The substance purchased on that date was subsequently analyzed at a DEA laboratory and determined to be 7.9 grams of heroin. After the sale, a surveillance agent observed Scola's car being followed by Nivar's Camry in the same part of Wakefield.

## Controlled Purchase on January 27, 2004

14. On January 26 and 27, 2004, the UCA had multiple recorded telephone conversations with Scola concerning another purchase of heroin. The UCA initially requested a half-ounce of heroin but Scola responded that he would not sell any more than ten grams at a time due to the penalties for trafficking. After extended negotiations concerning price, Scola agreed to sell the UCA thirteen grams of heroin for $145.00 per gram, stating that he sells grams to other customers for $160.00 and $200.00 per

8

gram.   When asked by the UCA how long he had been dealing with
his supplier, Scola stated that his friends have been dealing
with the supplier for about five years but that he had only been
dealing with him for about a year.

15.    On January 27, the UCA had another recorded telephone
conversation with Scola.  Scola stated that his supplier was
"scared to death" that the UCA wanted to purchase larger
quantities so quickly.  Scola related to the UCA that "the other
guy" (understood by the UCA to refer to the supplier) wanted
Scola to know more about the UCA and believed the UCA to be a
"cop."  The UCA assured Scola that there was no need for his
supplier to have concern and the two discussed the next heroin
sale.  The two agreed to meet at the same Cumberland Farms
parking lot in Reading, with Scola stating that he would be
accompanied by a female driver since his previous driver had lost
his vehicle.

16.    Later that day, the UCA placed a call to Scola and
advised Scola he was in the area and ready for the transaction.
Scola told the UCA that he was about to meet his supplier and
would then meet with the UCA.

17.    At about the same time, surveillance agents observed
Scola in a gray Mitsubishi, being driven by a female, parked in
Wakefield.  Shortly thereafter, surveillance agents observed
Nivar, driving his black Toyota Camry, pull next to the gray

9

Mitsubishi.  Scola then got into the rear passenger seat of Nivar's car and both cars drove away in tandem.

18.   A short while later, the gray Mitsubishi was observed arriving at the Cumberland Farms in Reading.  Scola, who had previously returned to the Mitsubishi, exited the vehicle and entered the UCA's car.  Scola sold a clear plastic bag of heroin to the UCA for $1,885.00 in cash.  Scola then exited the UCA's car and returned to the Mitsubishi.  The substance purchased on that date was subsequently analyzed at a DEA laboratory and was determined to be 12.8 grams of heroin.

19.   Surveillance agents then followed the Mitsubishi as it was driven back to the same location in Wakefield, where it met up with Nivar's black Camry.  The two cars then drove to a nearby side street and stopped.  Agents observed Scola exit from the Mitsubishi and enter Nivar's Camry.  Approximately two minutes later, Scola returned to the Mitsubishi.

### Controlled Purchase on February 3, 2004

20.   On February 2 and 3, 2004, Scola and the UCA had multiple telephone conversations concerning another purchase of heroin.  Scola agreed to meet the UCA at the same location in Reading in order to sell him 14 grams of heroin.  Prior to the sale, surveillance agents observed Scola seated in a purple Chevrolet Cavalier, being driven by another male and containing a female, parked at Wakefield.  A short time later, Nivar's black

10

Toyota Camry drove past Scola's car.  Scola and Nivar were observed to be talking on their cell phones at the time the two cars passed each other.  Shortly thereafter, the surveillance agents lost physical contact with the two vehicles.

21.    Minutes later, the purple Cavalier arrived at the Cumberland Farms parking lot in Reading.  The Cavalier drove into and out of the parking lot.  Scola contacted the UCA by telephone and claimed he had not seen the UCA's car.  After the UCA explained where his car was parked, Scola returned to the Cumberland Farms and got into the UCA's car.  Scola was nervous and refused to do the deal in the parking lot, stating that there were too many people in the parking lot, that he had gone to jail in the past, and that he was afraid to return to jail.  After the UCA refused to leave the parking area, Scola exited from the UCA's car and was driven from the area.

22.    The UCA and Scola subsequently engaged in several telephone conversations and ultimately agreed to meet at the parking lot at Kappy's Liquors in Peabody, Massachusetts.  When both cars arrived at the liquor store, Scola entered the UCA's car and exchanged a clear plastic bag containing a light brown powdery substance for $1,800.00 in United States currency.  The substance purchased on that date was subsequently analyzed at a DEA laboratory and determined to be 12.7 grams of heroin.

11

## Controlled Purchase on February 10, 2004

23.    On February 9 and 10, 2004, Scola and the UCA had multiple telephone conversations concerning another purchase cf heroin. Scola stated that he would contact his source of supply and that he would meet the UCA at the same Cumberland Farms parking lot in Reading on the afternoon of February 10 in order to sell the UCA an additional amount of heroin. On February 10, surveillance agents observed Scola and a female leave a residence in Gloucester in a white Hyundai. They drove directly to same area of Wakefield as Scola had used on prior occasions and parked. Approximately ten minutes later, Nivar's black Camry drove slowly by the white Hyundai. The Hyundai followed the Camry out of the area. At about this time, Scola called the UCA and told him to be at the location in Reading.

24.    Approximately ten minutes later, the white Hyundai pulled into the Cumberland Farms parking lot. Scola got out of the Hyundai and entered the UCA's car where he sold the UCA a clear plastic bag of heroin in exchange for $1,450.00 in cash. During this sale, Scola told the UCA that his source would be willing to deal directly with the UCA in March. The substance purchased that day was analyzed at a DEA laboratory and determined to be 9.7 grams of heroin.

25.    After the sale, Scola returned to the Hyundai, which was driven back to the same area in Wakefield. The Hyundai was

12

observed by surveillance agents meeting up with Nivar's black
Camry. Surveillance agents then followed Scola as he was driven
back to Gloucester.

### Controlled Purchase on February 18, 2004

26. On February 17 and 18, 2004, Scola and the UCA had
multiple telephone conversations concerning another purchase of
heroin. After a number of phone calls, Scola and the UCA agreed
to meet on February 18 at the same Cumberland Farms parking lot
in Reading for the purpose of selling heroin to the UCA. On the
afternoon of February 18, Scola called the UCA to state that he
would be arriving in a black pick-up truck, that he had contacted
his source of supply, and that the source was on his way. At
about 5:10 p.m., Scola called the UCA and stated that he was in
the area and that he was waiting for his source. Shortly after
this call, a surveillance agent observed Nivar's black Toyota
Camry in Wakefield.

27. At about 5:40 p.m., Scola arrived at the Cumberland
Farms parking lot in Reading in a black pick-up truck being
driven by a male. Scola exited from the truck, entered the UCA's
car, and sold the UCA a clear plastic package of heroin for
$1,450.00 in cash. The substance purchased that day was analyzed
at a DEA laboratory and determined to be 7.7 grams of heroin.

28. After the sale, surveillance agents observed the black
pick-up truck containing Scola being driven to Wakefield. The

13

pick-up truck parked next to Nivar's black Camry.  Scola then
entered Nivar's Camry and, after a few minutes, exited from the
Camry and returned to the pick-up truck, which was driven back to
Gloucester.

## Controlled Purchase on February 25, 2004

29.   On February 24 and 25, 2004, Scola and the UCA had
multiple telephone conversations concerning another purchase of
heroin.   They agreed to meet at the same Cumberland Farms parking
lot in Reading on the afternoon of February 25.   On that
afternoon, prior to the meeting, Scola called the UCA and stated
that he was in the area and waiting for his supplier.   Shortly
after 4:00 p.m., surveillance agents observed the same black
pick-up truck as was used in the prior deal driving in Wakefield.
Scola was a passenger in the truck, which was being driven by a
male.   Surveillance agents then observed Nivar driving his black
Toyota Camry in the same area.   The Camry also contained a male
passenger.   Both vehicles were observed driving in tandem in
Wakefield and then coming to a stop.   Scola exited from the pick-
up truck and entered the front passenger seat of Nivar's Camry.
After several minutes, Scola exited from the Camry and returned
to the pick-up truck, which was driven to the meeting location in
Reading.   Nivar remained in Wakefield.

30.   When Scola arrived at the meeting location, he entered
the front passenger seat of the UCA's car.   Scola sold the UCA a

14

clear plastic package of heroin for $1,450.00 in cash.  During
this sale, the UCA and Scola discussed the possibility of Scola
introducing the UCA to his supplier.  Scola stated that he was
working on this but that his supplier was nervous about meeting
the UCA.  The substance purchased that day was field-tested, with
a positive result for the presence of heroin.

31.    Immediately after this sale, surveillance agents
observed Scola return to the black pick-up truck, which was
driven back to the vicinity of Nivar's black Camry meet in
Wakefield.  Scola was observed entering the Camry and, after a
few minutes, returning to the black pick-up truck, which was
driven back to Gloucester.  Surveillance agents also followed
Nivar as he drove his Camry to a residence in Lawrence.  Nivar
and the other male were observed exiting from the Camry and
entering the residence.

### Controlled Purchase on March 4, 2004

32.    On March 1 and 2, 2004, the UCA and Scola had recorded
telephone conversations concerning another heroin purchase.
Scola stated, however, that his source was busy with an
appointment and that Scola could not get any product from his
source without giving money to the source on the spot.  After
subsequent telephone conversations on March 3 and 4, Scola agreed
to meet the UCA at the same Cumberland Farms parking lot in
Reading on the afternoon of March 4.

15

33.  On the afternoon of March 4, surveillance agents
observed Nivar's black Toyota Camry and the same black pick-up
truck driving in tandem in Wakefield.  Scola was observed exiting
from the pick-up truck and entering Nivar's Camry.  I observed
that Nivar was driving the Camry and that it contained another
male passenger.  Both the Camry (now containing Scola) and the
pick-up truck continued to drive out of the view of the
surveillance agents.

34.  A short time later, Scola arrived at the Cumberland
Farms parking lot in Reading.  Scola entered the UCA's car and
sold a clear plastic package of heroin to the UCA for $1,450.00
in cash.  During this sale, Scola stated that he meets with his
supplier every time he sells heroin to the UCA.  The substance
purchased that day was field-tested, with a positive result for
the presence of heroin.

35.  After the sale, surveillance agents followed the
pick-up truck to a location in Wakefield, where Scola used a pay
telephone to make a call.  After Scola returned to the pick-up
truck, surveillance agents followed it to Wakefield, where it met
up with Nivar's Camry.  Surveillance agents observed both
vehicles driving in tandem but they eventually drove out of view
of the surveillance agents.  A short time later, the pick-up
truck was followed by agents as it was driven back to Gloucester.

**Controlled Purchase on March 10, 2004**

36.   On March 9 and 10, 2004, Scola and the UCA had multiple telephone conversations and again agreed to meet at the same Cumberland Farms in Reading to conduct a heroin deal.  On the afternoon of March 10, prior to the deal, surveillance agents observed Nivar's Toyota Camry and a white Hyundai Sonata containing Scola driving together in the same part of Wakefield. A surveillance agent observed that Nivar was driving his Camry and that a female was driving the Hyundai.

37.   A short time later, the white Hyundai Sonata arrived at the Cumberland Farms parking lot.  Scola entered the UCA's car and sold the UCA a clear plastic package of heroin for $1,450.00 in cash.  The substance purchased that day was field-tested, with a positive result for the presence of heroin.

38.   Immediately after this sale, surveillance agents observed the white Hyundai Sonata driving in the same part of Wakefield but were unable to follow the vehicle.  Shortly thereafter, surveillance agents followed the Hyundai as it was driven back to Gloucester.

**Controlled Purchase on March 18, 2004**

39.   On and after March 14, 2004, the UCA had multiple telephone conversations with Scola, who stated that he was attempting to contact his supplier.  Scola eventually agreed to meet the UCA at the same Cumberland Farms in Reading on the

17

afternoon of March 18. During one telephone conversation on March 18, prior to the deal, the UCA and Scola talked about socializing on a Friday night. Scola indicated that he did not want to go out in Gloucester, stating "I kind of got a reputation for selling dope in Gloucester." On the afternoon of March 18, prior to the heroin deal, surveillance agents observed the same white Hyundai Sonata and Nivar's black Toyota Camry driving in tandem in Wakefield. Scola was a passenger in the Hyundai, which was being driven by a female. A short time later, a surveillance agent observed that Scola was sitting in the passenger seat of the Camry, that Nivar was driving the Camry, and that they appeared to be engaged in conversation. The Camry was being followed by the Hyundai. At one point, a surveillance agent observed that Scola was leaning forward as if he was holding something in his hands.

40. A short time later, the Hyundai arrived at the Cumberland Farms parking lot. Scola got into the UCA's car and sold the UCA a clear plastic package of heroin for $1,450.00 in cash. The substance purchased that day was field-tested, with a positive result for the presence of heroin.

41. After this sale, surveillance agents observed the Hyundai and Nivar's black Toyota Camry driving together in Wakefield. A surveillance agent observed that Nivar was driving the Camry, that he was using a cell phone, and that he was

18

looking in the direction of the Hyundai.  Shortly after these observations, a surveillance agent observed that Scola was a passenger in the Camry, that he and Nivar appeared to be engaged in conversation, and that the Camry was being followed by the Hyundai.  A short time later, surveillance agents observed Nivar driving his Camry on Route 128 while Scola and the female drove the Hyundai back to Gloucester.

### Controlled Purchase on March 24, 2004

42.  On March 24, 2004, Scola and the UCA again agreed to meet at the same Cumberland Farms in Reading to conduct a sale of heroin.  Scola arrived in the same white Hyundai Sonata, which was being driven by a female.  Scola got into the UCA's car and sold the UCA a clear plastic package of heroin for $1,450.00 in cash.  During this meeting, Scola remarked that he had recently been arrested for a driving offense.  The substance purchased on March 24 was field-tested, with a positive result for the presence of heroin.

43.  After this sale, surveillance agents followed the Hyundai to the same area in Wakefield, where it met up with Nivar's black Toyota Camry.  A surveillance agent observed that Nivar was driving the Camry.  After observing both vehicles driving in tandem, surveillance agents lost contact with them.  A short time later, surveillance agents followed the Hyundai as it was driven back to Gloucester.

19

**Controlled Purchase on March 30, 2004**

44.    On March 30, 2004, Scola and the UCA had recorded telephone conversations wherein they agreed to meet at the same Cumberland Farms in Reading to conduct a sale of heroin.  That afternoon, the UCA was called by Scola, who stated that he was with his supplier.  At about the same time, surveillance agents observed the same white Hyundai Sonata driving in Wakefield.  The Hyundai was being driven by a female and it contained Scola.

45.    A short time later, the white Hyundai arrived in the Cumberland Farms parking lot.  The UCA parked next to the Hyundai and conversed with the female, who was alone in the car.  Scola was inside the Cumberland Farms at this time.  During this conversation, the UCA learned that the female was aware of the purpose of the meeting.  Moments later, Scola entered the front passenger seat of the UCA's car and sold the UCA a clear plastic package of heroin in exchange for $1,450.00 in cash.  The substance purchased that day was field-tested, with a positive result for the presence of heroin.

46.    After the sale, surveillance agents followed the white Hyundai back to the same area in Wakefield, where it met up with Nivar's Camry.  The two cars drove together on various streets until they went out of view of the surveillance agents.  A short time later, surveillance agents followed the Hyundai back to Gloucester.

20

47.    Based on the foregoing, I believe that there is probable cause to believe that **Federico Nivar** is the source of supply of heroin for **Thomas Scola** and that, from December 2003 through March 2004, they conspired with each other to distribute heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 846.

_____
Steven C. Story
Special Agent, DEA


        Sworn to and subscribed before me this 7th day of April
2004.

_____
Marianne B. Bowler
Chief U.S. Magistrate Judge

21