UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>FEDERICO NIVAR, )<br>      Defendant )  | CRIMINAL NO. 04-CR-10135-GAO |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE

Now comes the United States, by its attorneys, Michael J. Sullivan, United States Attorney, and David G. Tobin, Assistant U.S. Attorney, and hereby moves this Honorable Court to deny the defendant's Motion to Suppress Fruits of Illegal Search and Seizure and Motion to Suppress Statements. The defendant asserts numerous grounds for suppression in his motion, essentially arguing first that the police lacked probable cause to arrest him or search his apartment. The defendant further argues that he never consented to the search of his apartment. Arguing in the alternative, the defendant asserts that assuming he did give consent to the search, the agents exceeded the scope of his consent. The defendant then asserts that any statement he made was obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966).

### FACTS

The indictment stems from a Drug Enforcement Administration ("DEA") Mobile Enforcement Team ("MET") operation on the North Shore of Massachusetts. The MET team was invited by the

Gloucester Police Chief to conduct undercover narcotics enforcement in the Town of Gloucester due to ongoing serious problems with widespread distribution of heroin and Oxycontin. Thomas Scola ("Scola") was identified as the single largest source of heroin in Gloucester by the local police. DEA Special Agent ("SA") Dan Genese, working in an undercover capacity, was introduced to Scola by a Confidential Source ("CS"). On December 10, 2003, SA Genese purchased six capsules of heroin from Scola for $300.00. This sale is not included in the indictment.

Between December 18, 2003 and March 30, 2004, SA Genese made thirteen controlled purchases of heroin directly from Scola. The first such purchase occurred in front of a motel in Gloucester, where Scola was then residing. The subsequent purchases occurred in the parking lot of a Cumberland Farms convenience store in Reading, except for one purchase, which occurred in a liquor store parking lot in Peabody. All of the distributions occurred in SA Genese's car, with only Scola and Genese present.

Virtually all thirteen sales followed the same pattern. Genese and Scola planned the sale over the telephone, setting the quantity, amount and location. Most, but not all, of their telephone conversations were recorded. After the December 18, 2003 transaction, each sale was planned for the Reading Cumberland Farms parking lot. The February 3rd sale was conducted in the Kappy's Liquors parking lot in Peabody, after

2

Scola failed to locate SA Geneses's car in the Cumberland Farm's parking lot.

DEA surveillance units observed Scola meet with the defendant before and/or after all the sales, except the December 18, 2003 sale which occurred in front of Scola's Gloucester residence. Immediately prior to most of the sales Scola, who never drove but over the course of the investigation used five different drivers, met the defendant in a residential neighborhood in Wakefield near the Reading Cumberland Farms. The defendant always drove a black Toyota Camry, that was registered to him, to these meetings. Scola and the defendant's meeting place was often at a lake in Wakefield or in a residential neighborhood near the lake. At various times, members of the surveillance unit observed Scola get into the defendant's car and stay a very short time before returning to whatever car he was being driven in on a particular day. On other occasions, the surveillance team observed the defendant's black Camry and Scola's car traveling in tandem into a residential neighborhood.

During the course of the investigation, Scola told SA Genese that he met with his source of heroin before each sale. He was observed meeting the defendant, his source, immediately after most of the heroin transactions as well. Scola arranged heroin sales with SA Genese, met the defendant, who fronted him the heroin, and used proceeds from the sale to pay the defendant

3

immediately after the sale.

### The Arrest

On Wednesday, April 7, 2004, SA Genese had multiple telephone conversations with Scola concerning another purchase of heroin. They agreed to meet at the same Cumberland Farms parking lot in Reading. Prior to the deal, surveillance agents observed the defendant driving from Lawrence to the Wakefield area in his black Toyota Camry. The Camry was stopped and the defendant was arrested on a federal warrant issued for this case. The defendant was transported from the scene of the arrest handcuffed in the back of a marked cruiser. Later, a quantity of packaged powder, that field-tested positive for heroin, was found partially stuffed into the backseat of the cruiser in close proximity to where the defendant had been seated. A police officer checked the cruiser earlier that day (as part of his routine) and there was no heroin in the police car.

Agents observed Scola and his girlfriend, Jill Doucette, driving in Wakefield in Doucette's white Hyundai Sonata. Doucette was driving. The car was stopped and Scola was arrested on a federal arrest warrant issued for this case. Doucette was arrested without a warrant based on probable cause. Doucette was advised of her Miranda warnings, waived her rights, and stated that she usually followed the defendant's Camry while Scola obtained the heroin from the defendant; that she drove Scola to

4

and from the deals with SA Genese, and that she intended to do the same on that date. Doucette stated that she used heroin and that she obtained heroin from Scola for doing the driving. She later admitted that she often took messages over the telephone from the defendant when Scola was unavailable.

Scola was also advised of his constitutional rights, stated that he understood his rights, and that he wished to speak with the agents. Scola admitted that he received the heroin he sold to SA Genese from the defendant.

At approximately 6:05 p.m., the defendant was informed of the charges against him and advised of his rights by MET Team member Essex County Deputy Sherif Maurice Aguilar. Deputy Sherif Aguilar, fluent in Spanish, spoke with the defendant in Spanish, using a DEA 13A to advise the defendant of his <u>Miranda</u> warnings. Contrary to the assertions made in the defendant's motion to suppress, Deputy Sherif Aguilar read the DEA 13A in its entirety to the defendant in Spanish. The rights advisement included, but was not limited to, that the defendant had the right to have an attorney present during questioning and that anything he said could be used against him.[1] The rights warning advisement was done in the presence of Essex County Deputy Sherif Amaurus

---

[1] The undersigned spoke with Maurice Aguillar, now a Lawrence Police Officer, over the telephone on March 23, 2005. Some of the facts included in the Government's response are derived from that conversation.

5

Calcano, also a Spanish speaker, and DEA SA Paul Karamourtopolous. The defendant waived his rights and agreed to speak with law enforcement. The defendant admitted supplying Scola regularly with heroin.

The defendant offered to assist the agents with getting in touch with a cocaine supplier. With the defendant's assistance, telephone contact was made with an individual the defendant identified as his supplier. This lead ultimately proved fruitless, as the supposed supplier's phone went dead and contact ceased. The contact with the defendant's supplier was made over the defendant's cell phone at the defendant's residence in Lawrence. Prior to entering the defendant's home, Deputy Sherif Aguilar obtained consent to search the residence from the defendant. Deputy Sherif Aguilar translated into Spanish a standard DEA-88 Consent to Search form for the defendant. The defendant signed the DEA-88. During the subsequent search, the agents found a large quantity of heroin, a small quantity of cocaine, and approximately $54,000.00 in cash. Contrary to the defendant's affidavit, at no time did the defendant or his girlfriend object to the search or instruct the agents to stop the search. A partial analysis of the cash has revealed that some of the recovered money was the buy money used by SA Genese in prior sales.

## ARGUMENT

### The Police Had probable Cause To Arrest The Defendant

Agents working with the Mobile Enforcement Team arrested the defendant on April 7, 2004, pursuant to a warrant issued by this Court (Bowler, CJ.). Probable cause existed to believe that the defendant was a participant in a conspiracy to distribute heroin.

DEA surveillance units observed Scola meet with the defendant before and/or after twelve of the thirteen controlled buys of heroin in this case. Immediately prior to most of the sales Scola met the defendant in a residential neighborhood in Wakefield near the Reading Cumberland Farms. Scola and the defendant often met at a lake in Wakefield or in a residential neighborhood near the lake. At various times, members of the surveillance unit observed Scola get into the defendant's car and stay a very short time before returning to his own vehicle. On other occasions, the surveillance team observed the defendant's black Camry and Scola's car traveling in tandem into a residential neighborhood.

During the course of the investigation, Scola told SA Genese that he met with his source of heroin before each sale. He was observed meeting the defendant, his source, immediately after most of the heroin transactions as well. The weight of the evidence in this case, as outlined above, establishes that Scola arranged heroin sales with SA Genese, met the defendant who

fronted him the heroin, and used proceeds from the sale to pay the defendant immediately after the sale.

### The Search Of The Defendant's Apartment Was Lawful

After his arrest on April 7, 2004, the defendant agreed to assist law enforcement with the arrest of a cocaine supplier. During the course of his cooperation, the defendant signed a DEA-88 Consent to Search form allowing law enforcement to search his apartment (attached). Deputy Sherif Aguilar translated the English-language form into Spanish for the defendant. At no time did the defendant withdraw his consent for the search. Neither he nor his girlfriend ever complained about the search or told the agents to stop the search. The search of the defendant's apartment was done with the expressed written consent of the defendant and it did not exceed the scope of the permission given by the defendant.

### The Defendant's Post-Arrest Statement was voluntary and Should Not Be Suppressed

Deputy Sherif Aguilar properly advised the defendant of his Miranda warnings in Spanish. Deputy Sherif Aguilar translated the rights listed on a standard DEA 13A into Spanish and read the rights verbatim to the defendant. The defendant's subsequent statement was voluntary. The totality of the circumstances indicate that the defendant cooperated with the police after his arrest, freely spoke with them, and attempted to assist them in

locating and arresting his source of supply. Undoubtedly, the defendant was motivated by a desire to curry favor with law enforcement in hopes of a more lenient disposition of his case. There is no evidence that the defendant was deprived of food, water, sleep, toilet facilities, representation by an attorney, or subjected to any improper or coercive treatment. The defendant's post-arrest statement was voluntarily, and should not be suppressed by the Court.

## Conclusion

The United States requests that the Court deny the defendant's motion to suppress and requests permission to file a supplemental brief after any motion hearing.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/ David G. Tobin
DAVID G. TOBIN
Assistant U.S. Attorney