UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 04-10135-GAO |
| ) | |
| FEDERICO NIVAR ) | |
| ) | |

DEFENDANT'S POST-HEARING MEMORANDUM IN
SUPPORT OF MOTION TO SUPPRESS FRUITS OF ILLEGAL SEARCH
AND SEIZURE AND MOTION TO SUPPRESS STATEMENTS

  Federico Nivar moved to suppress from evidence items, including alleged heroin and cocaine, seized from his home, as well as statements he allegedly made at the time of his arrest on April 7, 2004.  On June 23, 2005 and July 5, 2005, an evidentiary hearing was held before O'Toole, J.  Five witnesses testified: Essex County Deputy Sheriff Maurice Aguilar; Essex County Deputy Sheriff Amaurus Calcano; Drug Enforcement Administration Special Agent Paul Karamourtopoulos; Nydia Valentin; and Federico Nivar.

STATEMENT OF FACTS[1]

  On April 7, 2004, police officers arrested Mr. Nivar pursuant to a complaint filed in this Court.  Deputy Sheriffs Aguilar and Colcano testified that as Mr. Nivar drove his car onto a highway ramp in Wakefield, Massachusetts, his car was boxed in by two unmarked police cars, and numerous policemen, with their guns drawn, quickly surrounded his car.  Apparently without reason, one of the policemen, using his gun, smashed the car window next to where Mr. Nivar was sitting.  Mr. Nivar was pulled out of the car, pushed face-down on the ground, searched, and then put alone into the back of a police cruiser.

---

  [1]Counsel does not yet have a transcript of the hearing, so the statement of facts is from counsel's memory and counsel's notes taken during the hearing.

After his arrest, Mr. Nivar was taken to the Wakefield police station. Mr. Nivar testified that as he was being put into a holding cell at the station, Deputy Sheriff Aguilar, speaking Spanish, told him that if he did not cooperate, he was going to prison for 20 to 40 years. In addition, Aguilar said, the police would arrest his girlfriend, who was nine months' pregnant.

At the hearing, Deputy Sheriff Aguilar denied saying this to Mr. Nivar. He testified that the first time he saw Mr. Nivar at the station was at 6:05 p.m., when Mr. Nivar was sitting at a table in an open room where he was questioned.[2]

Deputy Sheriff Aguilar testified that he, Deputy Sheriff Calcano, and S.A. Karamourtopoulos interrogated Mr. Nivar at a table in an open area in the police station. S.A. Karamourtopoulos asked questions in English, and Deputy Sheriff Aguilar translated the questions into Spanish for Mr. Nivar.

Deputy Sheriff Aguilar said that he read Mr. Nivar his "Miranda rights" off a card. He could not remember if the rights were written in Spanish or if he translated them from English. Deputy Sheriff Calcano testified that Aguilar was holding a paper form written in English, which he translated to Mr. Nivar, who then signed it. S.A. Karamourtopoulos testified that he gave Aguilar a Miranda card to read from. At the hearing, at defense counsel's request, he

---

[2]Counsel's notes are unclear on this point but it seems that none of the three law enforcement personnel who testified could say how Mr. Nivar got from the holding cell to the area where he was questioned. Nor did any of them know whether Mr. Nivar was ever booked.
  Deputy Sheriff Aguilar testified that he did not go straight back to the Wakefield Police Station after Mr. Nivar's arrest, rather, he did "surveillance" in the Wakefield area before going to the station. Given, however, that Mr. Nivar was arrested at 5:10 p.m. and was being questioned by Deputy Sheriff Aguilar at 6:05, one has to wonder how much "surveillance" he performed.
  While all three officers denied telling Mr. Nivar that unless he cooperated, he was going to prison for 20 to 40 years and his pregnant girlfriend was going to be arrested, none of them could give any account of what was said to Mr. Nivar to induce him to cooperate.

produced what he said was the exact card. It had Spanish and English Miranda warnings on it, and did not have a place for the person who was being read his rights to sign.

Mr. Nivar said that before he spoke with the police, Deputy Sheriff Aguilar did inform him of some of his rights.[3] He said that he was told he had a right not to speak with the police and that if he could not afford a lawyer one would be provided to him. Mr. Nivar testified that it was not explained to him that anything he said could be used against him, nor was he told that he had a right to have a lawyer present <u>during questioning</u>. Mr. Nivar understood that he would not be able to speak to an attorney until he was taken to court. S.A. Karamourtopoulos testified that according to his notes taken during the interview with Mr. Nivar, at the same time Mr. Nivar was advised of his rights he was told that he would be taken to court the next day to see a Magistrate Judge concerning bail.

At the time Mr. Nivar was arrested, the police did not have a warrant to search his apartment. Although Mr. Nivar's apartment was under surveillance during the investigation of the case, none of the police could state that anyone had ever seen any drug deliveries to Mr. Nivar's house.

Mr. Nivar said that the officers proposed that he attempt to make a cocaine buy that night, and they insisted that the buy should take place at his apartment. Deputy Sheriffs Aguilar and Calcano testified that the buy was Mr. Nivar's idea. S.A. Karamourtopoulos initially testified that the undercover operation was Mr. Nivar's brainchild, however, he admitted on cross-examination that the officers proposed the idea, not Mr. Nivar.

---

[3] Mr. Nivar was not "experienced" in being given his <u>Miranda</u> warnings: he testified that while he had been arrested before, he was never read his rights.

In the same vein, the policemen all testified that it was Mr. Nivar who wanted the "deal" to take place in his apartment. Mr. Nivar testified that he would never have promoted such a plan because his pregnant girlfriend was at the apartment.

Mr. Nivar was taken from the police station to the parking lot of the Lawrence General Hospital, where numerous police were congregating and planning the controlled purchase at his house. Mr. Nivar said that while he was sitting in a police cruiser, handcuffed, an officer talked to him about whether anything or anyone in his house was going to pose a danger to the police. For example, he was asked if there were any weapons there, and he said no. Mr. Nivar testified that in trying to persuade the officers not to hold the deal at his apartment, he told them that there might be children present in the apartment. He said that they allowed him to call his girlfriend to tell her to make sure no one was present except her.

In the context of this conversation with the police, Mr. Nivar said that he was asked to sign a consent to search form. He testified that it was explained to him that he was giving the officers permission to look around his house for dangerous persons or weapons.

S.A. Karamourtopoulos testified that in the DEA-6 pertaining to Mr. Nivar's arrest, which he authored, he noted that while in the parking lot, Mr. Nivar was asked if there were any weapons or contraband in the apartment, and Mr. Nivar said there was not.

The consent to search form, which was admitted into evidence at the hearing, says only that "I have been asked to permit special agents to the drug enforcement administration to search...[a particular address],"     "I have not been threatened, nor forced in any way," and "I freely consent to this search."

S.A. Karamourtopoulos said that he was not paying attention when Mr. Nivar signed the consent to search form and did not know how he came to sign it. Deputy Sheriff Aguilar said that he translated the form to Mr. Nivar from English to Spanish but did not in any way explain to Mr. Nivar what he was consenting to. Deputy Sheriff Calcano saw Mr. Nivar sign the form, but could not remember what discussion Mr. Nivar had with anyone about whether the police were going to take a "quick look" around the apartment.

The police accompanied Mr. Nivar to his apartment. About an hour after arriving at the apartment, when it became clear that the anticipated buy was not going to occur, the officers began to conduct a thorough search. Mr. Nivar testified that he and his girlfriend both protested and asked them to stop. The police ultimately found more than 300 grams of heroin, seven grams of cocaine, and $54,000 in cash.

The three police witnesses denied that Mr. Nivar and his girlfriend told them to stop searching. While Deputy Sheriffs Aguilar and Calcano testified that Mr. Nivar's girlfriend was visibly upset and crying during the search, S.A. Karamourtopoulos insisted that she was calm and never said anything as the police were dumping out the contents of containers in the kitchen, rifling through drawers in the bedroom, and removing a heating vent from the wall in the living room. Although Deputy Sheriffs Aguilar and Calcano testified that she became particularly upset when they were rummaging though a suitcase of items for the newborn baby, and that she asked them to leave the suitcase alone, S. A. Karamourtopoulos said he never heard her protest any aspect of the search.

Nydia Valentin, a pharmacy technician and a friend of Mr. Nivar's girlfriend, testified that a neighbor of Mr. Nivar's called her to say that the neighbor could hear loud voices and a

commotion coming from Mr. Nivar's apartment and something bad was happening there. As Ms. Valentin approached the door of the apartment she could hear the girlfriend crying out loudly for the police to stop. When Ms. Valentin entered the apartment, she saw the girlfriend, hysterical, telling the police to stop searching. The girlfriend became particularly upset when the police began ransacking the suitcase filled with baby items, begging them not to search the suitcase. The police eventually permitted Ms. Valentin to take the girlfriend away.

## ARGUMENT

I.    Because Mr. Nivar's statements were not voluntary, and he was not informed of his Miranda rights in their entirety, his statements must be suppressed.

    A.    Law

"The voluntariness of an admission depends on 'whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances.'" United States v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990), quoting Bryant v. Vose, 785 F.2d 364, 367-68 (1st Cir. 1986). The burden is on the government to prove voluntariness by a preponderance of the evidence. Jackson, 918 F.2d at 241.

A confession extracted by overbearing a suspect's will through threats, violence, direct or implied promises, or the exertion of improper influences is not voluntary. Id. at 241-242. Cf. United States v. Burns, 15 F.3d 211, 217 (1st Cir. 1994) (statements not involuntary where defendant never was promised that he would not be arrested if he cooperated and setting of interrogation was not coercive).

The prosecution may not use statements obtained through custodial interrogation of a defendant unless it demonstrates that the defendant was informed of his right to remain silent, that anything he says can be used against him in court, that he has the right to have a lawyer present during questioning, and that a lawyer will be provided for him if he cannot afford a lawyer. Miranda v. Arizona, 384 U.S. 436, 444, 479 (1966).

Even if the government can prove that defendant was informed of his rights, the statements still must be suppressed unless the government can show by a preponderance of the evidence that defendant knowingly, intelligently, and voluntarily waived those rights. Colorado v. Connelly, 479 U.S. 157, 168 (1986); Miranda, 384 U.S. at 444.

> The inquiry has two distinct dimensions. . . . First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (citations omitted).

Of course, if defendant was not informed of his rights, he cannot possibly have waived them knowingly. Moreover, "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." Miranda, 384 U.S. at 475.

B. Application of law to facts

The circumstances indicate that any waiver Mr. Nivar made was not voluntary. He spoke only after he was arrested by having his car boxed in and his car window shattered by a

gun-wielding policeman, threatened with a long sentence, and told that his pregnant girlfriend would be arrested if he did not cooperate. Mr. Nivar's account of being told he would suffer a 20 to 40 year sentence and that his girlfriend would be arrested is credible. None of the police witnesses recalled anything concerning what happened to Mr. Nivar when he was first brought to the station. No one knew if he had been booked. There was no indication that he was allowed to make a telephone call. None of the three policemen who testified could recall how Mr. Nivar was put into the holding cell or got from the holding cell to the table where he was questioned. Deputy Sheriff Aguilar, whom Mr. Nivar recalled was the policeman who threatened him with the sentence and the arrest of his pregnant girlfriend, was particularly evasive concerning where he was when Mr. Nivar was first brought to the station, saying that he performed "surveillance" instead of going straight to the police station, even though barely an hour passed between Mr. Nivar's arrest on the highway and the beginning of his interrogation. Although it is obvious that S.A. Karamourtopoulos, who did not speak Spanish, arranged to interrogate Mr. Nivar in the presence of Deputy Sheriffs Aguilar and Colcano, who did, the officers professed not to remember how they came to be sitting at the table with Mr. Nivar.

      More telling, none of the three policemen who were present for the interrogation of Mr. Nivar could give any account of what conversation they had with him that led to his decision to cooperate. Clearly, Mr. Nivar was persuaded to talk to the police and give them details concerning drug dealing activities. His account of the threats made to him is more plausible than the officers' total lack of recall concerning the progression of events.

      With regard to Mr. Nivar's being read his rights, the testimony of the police witnesses was markedly inconsistent. S.A. Karamourtopoulos, who was the only witness who took notes

or wrote a report about the events, testified that he gave Aguilar a Miranda card to read from. He also testified that he does not speak any Spanish and could not say if Deputy Sheriff Aguilar properly read Mr. Nivar his rights. Deputy Sheriff Aguilar testified that he read Mr. Nivar his rights off a card, but could not remember if the rights were written in Spanish or if he translated them from English. Deputy Sheriff Calcano testified that Aguilar was holding a paper form written in English, which he translated to Mr. Nivar, who then signed it while "nodding" that he understood. Deputy Sheriff Calcano's testimony differs completely from the testimony of S.A. Karamourtopoulos, who offered a card from his wallet when asked by defense counsel, a card which does not have a place for a signature.

Regardless of how or whether Mr. Nivar received his rights, his purported waiver of them was not valid unless he understood them, and knowingly, intelligently, and voluntarily waived them. North Carolina v. Butler, 441 U.S. 369, 373 (1979). There was no credible evidence presented that Mr. Nivar understood whatever Deputy Sheriff Aguilar said to him. The only evidence offered on this point was Deputy Sheriff Calcano's statement that, as he signed the waiver form, Mr. Nivar was "nodding." In fact, Mr. Nivar did not understand two vital principles: that whatever he said might be used against him, and that he could have an attorney present at questioning. S.A. Karamourtopoulos's testimony concerning his notes, where he wrote that Mr. Nivar was informed of his rights and then in the same section wrote that he was told he would be taken to court the next day for bail, strengthens Mr. Nivar's contention that he thought he could only have an attorney when he got to court.

In short, Mr. Nivar's statements were not voluntary. First, his decision to talk was not the product of a "free and deliberate choice," Moran v. Burbine, supra, where he was suddenly

and violently arrested, threatened with a long prison sentence and threatened with the arrest of his pregnant girlfriend.  The fact that this case does not present the type of "gross abuses," such as beatings, that have resulted in finding confessions to be involuntary does not render the statements admissible.  See Mincey v. Arizona, 437 U.S. 385, 401 (1978).  Second, his waiver was not made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon [them]," Moran v. Burbine, supra, where he did not understand the rights he was waiving.  His statements should be suppressed.

II.     The search of Mr. Nivar's home was unlawful.

   A.  Law

As the police did not have a warrant to search Mr. Nivar's home, the government has the burden of showing that the challenged police conduct was lawful.  United States v. Melendez, 301 F.3d 27 (1st Cir. 2002).  Consensual searches are an exception to the Fourth Amendment's warrant requirement.  Florida v. Jimeno, 500 U.S. 248, 251 (1991).  The prosecution, however, must show by a preponderance of the evidence that any alleged consent was knowing, intelligent, and voluntarily given.  Bumper v. North Carolina, 391 U.S. 543, 548 (1968); Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); United States v. Perez-Montanez, 202 F.2d 434, 438 (1st Cir. 2000).

The standard for measuring consent is "objective reasonableness"; what would the typical reasonable person have understood by the exchange between the officer and the suspect? Florida v. Jimeno, supra; United States v. Donlin, 982 F.2d 31, 33 (1st Cir. 1992).  Whether consent is coerced or voluntary is a question of fact, to be determined after evaluating the totality of the circumstances.  United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989).  The

fact-finder must look beyond the language of consent to the context of the situation, including the actions and statements of the police. United States v. Turner, 169 F.3d 84, 87 (1st Cir. 1999). When deciding whether a suspect's consent to search was voluntary, courts have found factors such as whether the suspect was advised of his rights, or whether consent was obtained under inherently coercive circumstances to be pertinent. United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999), citing United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993) (voluntariness turns on factors including age, education, experience, intelligence, and knowledge of right to withhold consent); United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999)(court can consider whether subject was advised of constitutional rights and whether permission to search obtained under inherently coercive circumstances).

A consensual search may not exceed the scope of the consent given, United States v. Turner, supra at 87, and the burden is on the government to prove that the search was within the scope of the consent. United States v. Schaefer, 87 F.3d 562, 569 (1st Cir. 1996); United States v. Cruz Jimenez, 894 F.2d 16 (1st Cir. 1990).

B.  Application of law to facts

The police here engaged in a blatant ruse to search Mr. Nivar's house without a warrant. The police witnesses' uniform testimony that it was Mr. Nivar's idea to conduct the "buy" and to have it take place at his home is utterly incredible. S.A. Karamourtopoulos's eventual admission that it was the policemen's idea to conduct the buy points to the deception the police were engaging in. What are the chances that Mr. Nivar would have dreamed up a controlled buy, with Deputy Sheriffs Aguilar and Calcano acting as undercover agents? Why would Mr. Nivar have wanted the buy to take place at his home, in the presence of his hysterical, nine

months' pregnant girlfriend?  What possible reason could Mr. Nivar have had for leading the police to the precise spot where they ultimately found more than 300 grams of heroin, seven grams of cocaine, and $54,000 in cash?

The progression of events here was as follows.  First, the police improperly induced Mr. Nivar to "cooperate" by telling him that if he did not he would face a lengthy prison sentence and that his girlfriend, who was nine months' pregnant, would be arrested.  They did not properly explain his constitutional rights to him.  Then, the police proposed that he attempt to buy cocaine from someone and insisted that the deal be done at his house, thereby ensuring that they would be able to enter his house and stay there for some time.  Finally, when obtaining his signature on a consent to search form, they misled Mr. Nivar as to the scope of the search and its purpose.  The circumstances -- with Mr. Nivar in police custody, handcuffed, and without access to a lawyer -- were inherently coercive.  The Court should find that any "consent" Mr. Nivar gave for the search was not knowing, intelligent, or voluntarily given.  Bumper v. North Carolina, supra at 548; United States v. Forbes, supra at 5; United States v. Barnett, supra at 555; United States v. Coraine, supra at 309.

Even assuming arguendo that Mr. Nivar voluntarily consented to have the police conduct a search of his home, the search which the police conducted exceeded the scope of his consent.  Mr. Nivar testified that when he signed the consent to search form, he thought he was consenting to have the officers quickly check his home for persons or weapons.  The circumstances under which he signed the form support his testimony.  He signed the form while at the hospital parking lot, waiting to go to his apartment.  According to the policemen's testimony, the scene was chaotic, with numerous police cars and policemen milling around in

preparation for the staged buy at his home. One has to wonder why the police did not have him sign the form at the police station, where officers would have been talking quietly to him and paying attention to whether he understood what he was signing. Instead, S.A. Karamourtopoulos said that he was so busy at the hospital lot that he knew nothing about the circumstances around Mr. Nivar's signing the form. Similarly, Deputy Sheriff Calcano, who saw Mr. Nivar sign the form, testified that he did not know what Mr. Nivar was told about the form, or what discussion there might have been about the search. Deputy Sheriff Aguilar, who said that he read Mr. Nivar the form in Spanish, testified that he did not explain the form in any way to Mr. Nivar, he just read it and had Mr. Nivar sign it.

The form itself, written in a language Mr. Nivar could not read, is so vague as to be meaningless. The fact that the officers succeeded in having Mr. Nivar sign something which said merely that he gave permission "to search" does not establish that Mr. Nivar was apprised of the meaning of the form.

S.A. Karamourtopoulos testified that the DEA-6 pertaining to these events states that Mr. Nivar was asked, while he was in the hospital lot, whether he had guns or drugs at his apartment. This corroborates Mr. Nivar's testimony concerning the context of the conversation in which he was asked to sign the form, in which he said he believed the officers were concerned about their safety in his apartment and wanted permission to perform a quick search to see who was in the apartment and whether there were weapons there.

Finally, the policemen's testimony that neither Mr. Nivar nor his girlfriend told them to stop searching is not credible. Nydia Valentin testified that she clearly heard Mr. Nivar's girlfriend telling the police to stop searching. Mr. Nivar testified that when the police began to

thoroughly search, both he and his girlfriend protested and asked them to stop. S.A. Karamourtopoulos's testimony that the girlfriend was calm and did not object to the search, in direct contradiction to the testimony of Deputy Sheriffs Aguilar and Calcano on this point, is not credible and indicates an effort to distort the facts.

In sum, where Mr. Nivar consented only to a protective sweep, the thorough search of his home was beyond the scope of his consent. United States v. Turner, supra; United States v. Irizarry, 673 F.2d 554 (1st Cir. 1982) (reversing denial of suppression motion where search above displaced ceiling panel exceeded scope of protective sweep).

This Court should suppress all evidence found in the apartment, and any statements Mr. Nivar may have made there, as they are the direct, unattenuated product of the unconstitutional search. Wong Sun v. United States, 371 U.S. 471, 487 (1963).

## CONCLUSION

For the reasons set out above, the evidence obtained as a result of the interrogation of Mr. Nivar and the search of his home should be suppressed.

>                    FEDERICO NIVAR
>                    By his attorney,
>
>                    /s/ Page Kelley
>                    Page Kelley
>                      B.B.O. #548237
>                    Federal Defender Office
>                    408 Atlantic Avenue, 3rd Floor
>                    Boston, MA  02110
>                    Tel: 617-223-8061

July 21, 2005